UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LOVELYN GORDON, individually and on
behalf of all others similarly situated,

                           Plaintiff,

      v.

TARGET CORPORATION,

                          Defendant.

No. 20-CV-9589 (KMK)

<u>OPINION & ORDER</u>

Spencer Sheehan, Esq.
Sheehan & Associates, P.C.
Great Neck, NY
*Counsel for Plaintiff*

Paul Garrity, Esq.
Sheppard, Mullin, Richter & Hampton LLP
New York, NY
*Counsel for Defendant*

KENNETH M. KARAS, United States District Judge:

        Lovelyn Gordon ("Plaintiff") brings this putative class action against Target Corporation ("Defendant"), alleging that the labeling on Defendant's "Toddler Next Stage" toddler drink is deceptive and misleading. Plaintiff asserts claims for damages against Defendant for (1) violations of §§ 349 and 350 of the New York General Business Law ("GBL"), N.Y. G.B.L. §§ 349, 350; (2) violation of the Magnuson-Moss Warranty Act ("MMWA"), 15 U.S.C. §§ 201, et seq.; (3) common law breach of express warranty; (4) common law breach of the implied warranty of merchantability; (5) common law negligent misrepresentation; (6) common law fraud; and (7) unjust enrichment. (*See generally* First Am. Compl. ("FAC") (Dkt. No. 11).) Plaintiff also seeks injunctive relief to correct the alleged misrepresentations. (*See id.* at 17.)

Before the Court is Defendant's Motion To Dismiss the Amended Complaint (the "Motion"). (*See* Not. of Mot. (Dkt. No. 17).)  For the foregoing reasons, the Motion is granted.

## I.  Background

### A.  Materials Considered

As a threshold matter, the Court determines the proper treatment of eight documents that Defendant has requested the Court consider in deciding this Motion, either on the grounds that the documents were incorporated into the First Amended Complaint ("FAC") by reference or that the Court may take judicial notice of the documents as public records.

Generally, "[w]hen considering a motion to dismiss, the Court's review is confined to the pleadings themselves," because "[t]o go beyond the allegations in the [c]omplaint would convert the Rule 12(b)(6) motion to dismiss into one for summary judgment pursuant to [Rule] 56." *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 275 (S.D.N.Y. 2002). "Nevertheless, the Court's consideration of documents attached to, or incorporated by reference in the [c]omplaint, and matters of which judicial notice may be taken, would not convert the motion to dismiss into one for summary judgment." *Id.*; *see also Bellin v. Zucker*, 6 F.4th 463, 473 (2d Cir. 2021) (explaining that "when ruling on Rule 12(b)(6) motions to dismiss," courts may "consider the complaint in its entirety . . . , documents incorporated into the complaint by reference, and matters of which a court may take judicial notice" (quotation marks omitted)); *Hu v. City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a Rule 12(b)(6) motion, the court may consider 'only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings, and matters of which judicial notice may be taken.'" (alteration omitted) (quoting *Saimels v. Air Transp. Local 504*, 992 F.2d 12, 15 (2d Cir. 1993))).

And, "in adjudicating a motion to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), a district court may resolve disputed factual issues by reference to evidence

outside the pleadings, including affidavits." *Rutherford v. Fla. Union Free Sch. Dist.*, No. 16-CV-9778, 2019 WL 1437823, at *2 (S.D.N.Y. Mar. 29, 2019) (alterations omitted) (quoting *JTE Enters., Inc. v. Cuomo*, 2 F. Supp. 3d 333, 339 (E.D.N.Y. 2014)).

Defendant argues that several of the documents in question were incorporated into the FAC by reference; specifically, (1) a rendering of the Product's full label, (2) the full image of the Non-GMO Project's verification seal, and (3) a publication referenced in the FAC.  (*See* Def.'s Request for Judicial Not. ("Def.'s RJN") 3 (Dkt. No. 19); *see also* Def.'s RJN Exs. 1–3 (Dkt. Nos. 19-1, 19-2, 19-3).)  The Court agrees.  "Generally, a court may incorporate documents referenced where (1) [the] plaintiff relies on the materials in framing the complaint, (2) the complaint clearly and substantially references the documents, and (3) the document's authenticity or accuracy is undisputed." *Stewart v. Riviana Foods Inc.*, No. 16-CV-6157, 2017 WL 4045952, at *6 (S.D.N.Y. Sept. 11, 2017) (emphasis omitted) (collecting cases).  Plaintiff clearly relied on all three documents in framing the FAC and all three documents are clearly and substantially referenced in the FAC.  (*See, e.g.*, FAC ¶¶ 5 & n.3, 10–21, 23, 25, 27, 45–46, 54.)  Moreover, Plaintiff does not challenge their authenticity or accuracy.  (*See generally* Pl.'s Mem. of Law in Opp'n to Mot. To Dismiss ("Pl.'s Mem.") (Dkt. No. 20).)  As such, the Court will consider these documents in ruling on Defendant's Motion.  *See Stewart*, 2017 WL 4045952, at *6–7 (considering images of packaging of product at issue as incorporated by reference into complaint); *see also N. Am. Olive Oil Ass'n v. D'Avolio Inc.*, 457 F. Supp. 3d 207, 220 (E.D.N.Y. 2020) ("A court may consider the full text of documents partially quoted in the complaint so long as there is no dispute regarding the accuracy or authenticity of the document.").

Defendant argues that the Court may take judicial notice of five other documents: (1) a U.S. Food & Drug Administration ("FDA") guidance document entitled "Nutrition and Supplement Facts Labels: Questions and Answers Related to the Compliance Date, Added Sugars, and Declaration of Quantitative Amounts of Vitamins and Minerals," (2) an FDA guidance document entitled "Labeling of Infant Formula," (3) an FDA guidance document entitled "Voluntary Labeling Indicating Whether Foods Have or Have Not Been Derived from Genetically Modified Plants," (4) a copy of the FDA's informational webpage entitled "GMO Crops, and Food for Animals," and (5) a copy of the FDA's informational webpage entitled "GMO Crops, Animal Food, and Beyond." (*See* Def.'s RJN 3; *see also* Def.'s RJN Exs. 4–8 (Dkt. Nos. 19-4, 19-5, 19-6, 19-7, 19-8).) The Court, again, agrees with Defendant. "Courts may take judicial notice of public documents or documents of public record" in addition to "records of administrative bodies," such as government agencies like the FDA. *Casey v. Odwalla, Inc.*, 338 F. Supp. 3d 284, 294 (S.D.N.Y. 2018) (collecting cases). As such, courts routinely take judicial notice of FDA guidance documents and documents which are publicly available on the FDA's website. *See, e.g.*, *Apotex Inc. v. Acordia Therapeutics, Inc.*, 823 F.3d 51, 59–60 (2d Cir. 2016) (taking judicial notice of FDA guidance document); *Simon v. Smith & Nephew, Inc.*, 990 F. Supp. 2d 395, 401 n.2 (S.D.N.Y. 2013) (taking judicial notice of "public records contained on the FDA website"). The Court will do the same here.

Plaintiff's argument in opposition to the Court's consideration of these document relies on two cases, *Cabrera v. Schafer*, 178 F. Supp. 3d 69 (E.D.N.Y. 2016), and *Kortright Capital Partners LP v. Investcorp Investment Advisers Ltd.*, 327 F. Supp. 3d 673 (S.D.N.Y. 2018), (*see* Pl.'s Mem. 12), but neither concerned the consideration of documents outside of the four corners of the pleadings on a motion to dismiss. *See Kortright*, 327 F. Supp. 3d at 688 (declining the

plaintiff's invitation for the court to "sift through the record" in considering a motion for sanctions); *Cabrera*, 178 F. Supp. 3d at 71–72 (considering motion in limine by the defendants for an order taking judicial notice of adjudicative facts). As such, Plaintiff's arguments in reliance on these cases are inapplicable.

Plaintiff also argues that "[s]hould the Court take judicial notice of Defendant's exhibits, it should be 'for the limited purpose of determining what statements it contains' [sic], 'not for the truth of the matters' [sic] as alleged by Defendant." (Pl.'s Mem. 12 (quoting *Force v. Facebook, Inc.*, 934 F.3d 53, 59 n.5 (2d Cir. 2018)).) Plaintiff recounts the correct standard, and the Court will follow it.

### B. Factual Background

The following facts are drawn from the FAC and assumed to be true for the purposes of resolving the instant Motion. *See Div. 1181 Amalgamated Transit Union-N.Y. Emps. Pension Fund v. N.Y.C. Dep't of Educ.*, 9 F.4th 91, 94 (2d Cir. 2021) (per curiam). Where relevant, the Court also recounts facts from the various other materials the Court has ruled it may consider at this stage.

Defendant is a company which sells products ranging from groceries to consumer electronics in its approximately 1,900 stores located in all 50 states. (*See* FAC ¶¶ 75–76.) Defendant's private labels, or store brands, are known for their high quality and are considered equivalent to their branded counterparts. (*See id.* ¶ 77.) One such store brand is Defendant's up & up™ brand, which Defendant uses for its consumer health products. (*See id.* ¶ 78.) Among other things, Defendant manufactures, markets, and sells milk-based powder products enriched with iron to both infants and non-infants under its up & up™ brand. (*See id.* ¶¶ 1, 10.) This Action involves Defendant's up & up™ branded "Toddler Next Stage" product (the "Product"), a milk-based powder drink designed for toddlers over the age of one year. (*See id.* ¶¶ 1, 15, 78.)

### 1.  Transition Formulas and Toddler Nutrition

By way of background, Plaintiff alleges that since 2003, rates of breastfeeding have increased significantly, which has resulted in a decrease in sales of infant formula.  (*See id.* ¶ 6.) To make up for such declining sales of infant formulas, companies have introduced products marketed as "transition formulas," "follow-on formulas," "weaning formulas," "toddler milks," and "growing-up milks" (hereinafter, "Transition Formulas") and designed for children between 12 and 36 months old (i.e., above the age of infancy) which are effectively just re-branded infant formula.  (*Id.* ¶¶ 7, 33.)  Between 2003 and 2015, advertising spending on Transition Formulas has quadrupled and sales have nearly tripled.  (*See id.* ¶ 8.)

However, Plaintiff alleges that while infant formula is federally regulated and recognized by pediatric health experts as an accepted alternative to breastmilk, Transitional Formulas are not federally regulated and not recommended by pediatric health experts as a means of meeting toddlers' nutritional needs.  (*See id.* ¶¶ 2, 3, 5, 9.)  Rather, experts advise that beyond the age of 12 months, children's nutritional needs should be met with whole cow's milk, water, and healthy whole foods as part of a balanced diet.  (*See id.* ¶ 5.)  Transitional Formulas are more expensive than alternatives like whole cow's milk and offer no unique nutritional value; to the contrary, Transitional Formulas often contain added sugars, the consumption of which by toddlers is universally opposed by child nutrition experts.  (*See id.* ¶¶ 22, 33–34.)

Defendant's Product is a Transitional Formula, which Plaintiff alleges "is advertised and marketed in a way that is near-identical to" Defendant's up & up™ branded infant formula (the "Infant Formula"), "through a common labeling format, images, design, type size, fonts, call-outs[,] and graphics."  (*Id.* ¶ 10.)  Defendant's Infant Formula is labeled "infant," with two sub-headings reading "infant formula" and "milk-based powder."  (*Id.*)  The Infant Formula also includes the following in smaller print:  "[c]ompare to the nutrition of Enfamil Premium®

Infant," "closer to breast milk," and "DHA and dual prebiotics." (*Id.*) Finally, the Infant Formula contains a graphic labeled "Triple Care" and including smaller graphics for "immunity," "brain," and "development." (*Id.*) The Product is labeled "toddler next stage®," with two sub-headings reading "milk drink powder" and "natural milk flavor with other natural flavors." (*Id.*) The Product also includes the following in smaller print: "[c]ompare to the nutrition of Enfagrow® Toddler Next Step® & Similac Go & Grow®," "new and improved formulation," "DHA and iron to help support brain development," "calcium and vitamin D for strong bones," and "natural milk flavor with other natural flavors." (*Id.*) Finally, the Product contains a graphic labeled "Neuro Support" and including smaller graphics for "cognitive," "social," "motor," and "language." (*Id.*) In the FAC, Plaintiff provides photos of both products:



(*See* FAC ¶ 10 (Defendant's Infant Formula).)



(*See id.* (Defendant's Product).)

Plaintiff alleges that the similarities between the labeling of the two products gives caregivers of toddlers "the incorrect impression that the [Product] is nutritionally adequate for children over [one] year [of age]" and attempts to "ride the coattails of the carefully regulated [Infant Formula] to drive sales." (*Id.* ¶¶ 14, 16.) Plaintiff alleges that the Product's label is made even more misleading because it contains an infant formula panel on the reverse side of the container in addition to the nutrition facts panel. (*See id.* ¶¶ 17, 19.) Plaintiff alleges that the infant formula panel is in a format that caregivers would know is unique to highly regulated infant formulas, and is misleading "because it gives caregivers the impression that the Product, like infant formula, is subject to heightened and specific FDA regulations." (*See id.* ¶¶ 18, 20.)

Defendant has provided photos of the back side of the Product's container:



(*See* Def.'s RJN Ex. 1 (back side of the Product's container, including infant nutrition panel).)



(*See id.* (back side of the Product's container, including nutrition facts).)

Plaintiff alleges that like other Transition Formulas, the Product is actually contrary to toddlers' nutritional needs, including because it contains two grams of added sugar per serving. (*See* FAC ¶ 23.)  Plaintiff alleges that the fact that the Product contains added sugar is concealed from caregivers buying the Product because it is only shown via the inclusion of "corn syrup solids" in the fine-printed ingredients list.  (*See id.* ¶¶ 23, 24.)  Moreover, the Product is both less nutritious and more expensive than whole cow's milk.  (*See id.* ¶¶ 25–30.)  As compared to whole cow's milk, the Product contains 0.31 fewer grams of protein, 0.02 more grams of fat, 13.86 more grams of carbohydrates, and 11 more calories per 8 fluid ounces.  (*See id.* ¶ 25.) And, the Product costs approximately $14.35 per gallon, whereas whole cow's milk costs approximately $3.85.  (*See id.* ¶¶ 26–30.)

### 2.  Non-GMO Representation

Plaintiff alleges that in recent years, consumers have become significantly more aware of and sensitive to genetically modified organisms ("GMOs") in their food and try to avoid GMOs to avoid negative health and environmental impacts.  (*See id.* ¶¶ 36, 38.)  This is particularly important to consumers when providing nutrition to young children.  (*See id.* ¶ 37.)  To meet consumer demand for non-GMO products, an industry of independent, third-party validation companies has developed, wherein independent organizations review a product's ingredients and verify to consumers that the product does not contain GMOs or byproducts from animals who have consumed GMO feed.  (*See id.* ¶¶ 39–40.)  Obtaining a third-party verification that a product is non-GMO allows companies to set that product at a higher price.  (*See id.* ¶ 41.) Given the value that such independent verifications offer to companies, the Federal Trade Commission ("FTC") has warned companies to be careful in making representations about independent certifications; FTC guidelines state that "[i]t is deceptive to misrepresent, directly or

by implication, that a product, package, or service has been endorsed or certified by an independent third party." (*Id.* ¶¶ 42–43 (quoting 16 C.F.R. §§ 260.6(a)).)

Plaintiff alleges that Defendant represents that the Product has been verified by an independent third-party as non-GMO via the inclusion of a graphic that reads "non-GMO" with the sub-heading: "ingredients not genetically engineered." (*See id.* ¶ 45.) Plaintiff alleges that Defendant has "intentionally mimicked the content and message of the foremost independent verification organization—the Non-GMO Project," a non-profit organization that is considered a world leader in non-GMO testing, certification, and consulting. (*Id.* ¶¶ 46–49.) The Non-GMO Project's Product Verification Program verifies that products are not derived from GMO crops and that meat and milk are not derived from animals fed GMO crops. (*See id.* ¶ 50.) Plaintiff alleges that Defendant deliberately mimicked the Non-GMO Project's Product Verification Program seal on the Product's label to mislead consumers into believing that the Product does not contain milk derived from animals fed GMO crops, when, in truth, the Product contains dairy ingredients including milk and lactose that came from cows fed GMO grains. (*See id.* ¶¶ 51–55.) As a result of this allegedly deceptive seal, consumers allegedly paid a premium to purchase a non-GMO product that, in fact, contained ingredients that were produced with GMOs. (*See id.* ¶ 60.)

Plaintiff has provided a close-up photo of the non-GMO graphic on the Product, and Defendant has provided a photo of the Non-GMO Project's Product Verification Project's seal.



(*See id.* ¶ 45.)



(*See* Def.'s RJN Ex. 2.)

### 3.  Defendant's Experience

Plaintiff either "is or was a caregiver" for children older than one year old, and in May

2020, bought the Product on at least one occasion at Defendant's store located at 500 East

Sanford Boulevard, Mount Vernon, NY because she expected it would be nutritionally adequate

for the children she cared for.  (FAC ¶¶ 79–80.)  Plaintiff alleges that she "paid more for the

Product than she would have paid otherwise" "absent Defendant's false and misleading

representations and omissions."  (*Id.* ¶¶ 81–82.)  Plaintiff alleges that she "intends to, seeks to,

and will purchase the Product again when she can do so with the assurance that [the] Product's

representations about its components and ingredients are consistent with its representations."

(*Id.* ¶ 83.)

### C.  Procedural History

Plaintiff filed her initial Complaint on November 15, 2020.  (*See* Dkt. No. 1.)  On

April 13, 2021, Defendant filed a pre-motion letter in anticipation of filing a motion to dismiss.

(*See* Dkt. No. 8.)  Plaintiff filed the FAC on May 4, 2021.  (*See* FAC.)  On May 18, 2021,

Defendant again filed a pre-motion letter in anticipation of filing a motion to dismiss.  (*See* Dkt.

No. 12.)  Following Plaintiff's response to Defendant's pre-motion letter, (*see* Dkt. No. 13), the

Court held a pre-motion conference on July 13, 2021, (*see* Dkt. (minute entry for July 13, 2021)). Pursuant to the briefing schedule adopted at this conference, Defendant filed the instant Motion and supporting papers on August 13, 2021. (*See* Not. of Mot.; Def.'s Mem. of Law in Supp. of Mot. To Dismiss ("Def.'s Mem.") (Dkt. No. 18); Def.'s RJN.) Plaintiff filed her Opposition on September 10, 2021, (*see* Pl.'s Mem.), and Defendant filed its Reply on September 24, 2021, (*see* Def.'s Reply Mem. of Law in Supp. of Mot. To Dismiss ("Def.'s Reply Mem.") (Dkt. No. 21)). On November 3, 2021, Plaintiff notified the Court of persuasive authority from the United States District Court for the Eastern District of New York. (*See* Dkt. No. 22.)

## II.  Discussion

### A.  Standard of Review

Defendant moves to dismiss the FAC pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (*See* Not. of Mot.) "The standard of review for a motion to dismiss under Rule 12(b)(1) is substantively 'identical' to the standard for a Rule 12(b)(6) motion." *McNeil v. Yale Chapter of Alpha Delta Phi Int'l, Inc.*, No. 21-639, 2021 WL 5286647, at *1 (2d Cir. Nov. 15, 2021) (quoting *Moore v. PaineWebber, Inc.*, 189 F.3d 165, 169 n.3 (2d Cir. 1999)). "In deciding both types of motions, the Court must accept all factual allegations in the complaint as true, and draw inferences from those allegations in the light most favorable to the plaintiff." *Gonazalez v. Option One Mortg. Corp.*, No. 12-CV-1470, 2014 WL 2475893, at *2 (D. Conn. June 3, 2014) (quotation marks omitted). However, "[o]n a Rule 12(b)(1) motion, . . . the party who invokes the Court's jurisdiction bears the burden of proof to demonstrate that subject matter jurisdiction exists, whereas the movant bears the burden of proof on a motion to dismiss under Rule 12(b)(6)." *Id.* (citing *Lerner v. Fleet Bank, N.A.*, 318 F.3d 113, 128 (2d Cir. 2003)); *see also Gerasimov v. Amalgamated Hous. Corp.*, No. 21-CV-1760, 2021 WL 6338522, at *3

(S.D.N.Y. Dec. 17, 2021) ("The only difference between Rule 12(b)(1) and 12(b)(6) motions is the allocation of the burden of proof.").

### 1.  Rule 12(b)(1)

"A federal court has subject matter jurisdiction over a cause of action only when it has the authority to adjudicate the cause pressed in the complaint." *Bryant v. Steele*, 25 F. Supp. 3d 233, 241 (E.D.N.Y. 2014) (quoting *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008)). "Determining the existence of subject matter jurisdiction is a threshold inquiry, and a claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when a district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (citation omitted); *see also McNeil*, 2021 WL 5286647, at *1 ("Dismissal is proper under Rule 12(b)(1) for lack of subject matter jurisdiction 'when the district court lacks the statutory or constitutional power to adjudicate' the claim, such as when Article III standing is not met." (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000))).  "In adjudicating a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the court may consider matters outside the pleadings." *Rutherford*, 2019 WL 1437823, at *2 (citation omitted).

### 2.  Rule 12(b)(6)

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted).  Indeed, Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Nor does a complaint suffice if it tenders naked assertions

devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting FED. R. CIV. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw all reasonable inferences in the plaintiff's favor," *Div. 1181*, 9 F.4th at 95 (citation omitted). Additionally, "when ruling on Rule 12(b)(6) motions to dismiss," district courts are directed to confine their consideration to "the complaint in its entirety, . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Bellin*, 6 F.4th at 473 (quotation marks omitted); *see also Dashnau v. Unilever Mfg. (US), Inc.*, 529 F. Supp. 3d 235, 240 (S.D.N.Y. Mar. 26, 2021) (same).

Finally, fraud claims—including common law fraud claims—are subject to the heightened pleading standard set forth in Rule 9(b). *See Matana v. Merkin*, 957 F. Supp. 2d 473, 484 (S.D.N.Y. 2013) ("[A] claim for common law fraud under New York law must satisfy the requirements of the heightened pleading standard under Federal Rule of Civil Procedure 9(b)." (citing cases)). Rule 9(b) provides: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b). However, courts "'must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations,'" rather "'plaintiffs must allege facts that give rise to a strong inference of fraudulent intent.'" *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)). "An inference is 'strong' if it is cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*, 460 F. Supp. 3d 481, 492 (S.D.N.Y. 2020) (quoting *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 176–77 (2d Cir. 2015)).

## B.   Analysis

Defendant argues that (1) Plaintiff lacks standing to seek injunctive relief, (*see* Def.'s Mem. 7–9); (2) Plaintiff's GBL claims fail because no reasonable consumer would be misled by the Product's label, the label complies with federal regulations, and Plaintiff does not plausibly plead injury, (*see id.* at 9–20); (3) Plaintiff fails to state a claim for fraud because Plaintiff has failed to adequately plead scienter, (*see id.* at 20–22); (4) Plaintiff fails to state a claim for negligent misrepresentation because Plaintiff has failed to allege the existence of a special relationship or privity with Defendant, (*see id.* at 22); (5) Plaintiff has failed to identify a specific affirmation of fact or promise that is misleading, and thus cannot state a claim for breach of

16

express warranty, (*see id.* at 22–23); (6) Plaintiff does not allege that the Product was unfit for

human consumption, and thus fails to state a cognizable claim for breach of the implied warranty

of merchantability, (*see id.* at 24); (7) Plaintiff's MMWA claim fails because Plaintiff has failed

to state a cognizable claim for breach of an express or implied warranty, (*see id.* at 23 n.6); and

(8) Plaintiff's unjust enrichment claim must be dismissed as duplicative, (*see id.* at 24–25).

     The Court addresses each argument in turn.

     1.  Standing to Seek Injunctive Relief

     Article III of the Constitution restricts federal judicial power to the resolution of cases

and controversies.  U.S. CONST. art. III, § 2.  "That case-or-controversy requirement is satisfied

only where a plaintiff has standing."  *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 544 U.S.

269, 273 (2008).  "Article III standing requires plaintiffs to show (1) an 'injury in fact,' (2) a

'causal connection' between that injury and the conduct at issue, and (3) a likelihood 'that the

injury will be redressed by a favorable decision.'"  *Maddox v. Bank of N.Y. Mellon Tr. Co., N.A.*,

19 F.4th 58, 62 (2d Cir. 2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).

"[A] plaintiff must demonstrate standing for each claim and form of relief sought," *Cacchillo v.

Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) (quoting *Baur v. Veneman*, 352 F.3d 625, 642

n.15 (2d Cir. 2003)), and a plaintiff "seeking injunctive relief must also prove that the identified

injury in face presents a real and immediate threat of repeated injury," *Kreisler v. Second Ave.

Diner Corp.*, 731 F.3d 184, 187 (2d Cir. 2013).  "Although past injuries may provide a basis for

standing to seek money damages, they do not confer standing to seek injunctive relief unless the

plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way."

*Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016).  And, "[a] plaintiff seeking to

represent a class must personally have standing."  *Id.* (citing *Lewis v. Casey*, 518 U.S. 343, 357

(1996)).

Defendant argues that Plaintiff's allegation that she "intends to, seeks to, and will purchase the product again when she can do so with the assurance that the Product's representations about its components and ingredients are consistent with its representations," (FAC ¶ 83), fails to demonstrate that she is likely to suffer future harm, and thus, that she does not have standing to seek injunctive relief—either personally or on behalf of the proposed class, (*see* Def.'s Mem. 7–9). The Court agrees. The Second Circuit recently held in *Berni v. Barilla S.p.A.* that past purchasers of a consumer product who claim to be deceived by that product's packaging . . . have, at most, alleged a past harm." 964 F.3d 141, 147 (2d Cir. 2020). The court explained that "[i]n the first place, past purchasers are not bound to purchase a product again—meaning that once they become aware they have been deceived, that will often be the last time they will buy that item." *Id.* "But even if they do purchase it again, there is no reason to believe that [past purchasers] will incur a harm anew," since "they will not again be under the illusion that" the product meets the standard they alleged was promised on the deceptive label. *Id.* at 148. Rather, "next time they buy one of the [products], they will be doing so with exactly the same level of information they claim they were owed from the beginning." *Id.*

Such is the case with Plaintiff here. Because Plaintiff allegedly is now aware that the Product is not recommended by pediatric health experts, does not offer superior nutritional value to the less-expensive whole cow's milk, and is not non-GMO, Plaintiff cannot plausibly again be deceived by the Product's label, regardless of whether it is changed.[1] As such, Plaintiff cannot allege any future harm and, thus, lacks standing to seek injunctive relief. *See Brown v. Kerry Inc.*, No. 20-CV-9730, 2021 WL 5446007, at *11 (S.D.N.Y. Nov. 22, 2021) (finding that the

---

[1] To be clear, the Court is making no findings of fact as to whether any of those descriptions as to the Product are accurate.

plaintiff who alleged that she "intends to, seek[s] to, and will purchase the [p]roduct again when she can do so with the assurance that [the] [p]roduct's labels are consistent with the [p]roduct's components" lacked standing to seek injunctive relief because "such conditional statements of a consumer's intent to repurchase a product are insufficient to allege a likelihood of future injury" (quotation marks omitted)), *report and recommendation adopted*, 2022 WL 669880 (S.D.N.Y. Mar. 7, 2022); *Rivera v. S.C. Johnson & Son, Inc.*, No. 20-CV-3588, 2021 WL 4392300, at *8–9 (S.D.N.Y. Sept. 24, 2021) (finding that plaintiffs who alleged that they would buy the products again "if assured they did not contain components which were toxic and had the harsh physical and environmental effects they did" did not have standing to seek injunctive relief because "[t]he [c]ourt cannot conceive of a scenario in which these [p]laintiffs would again be deceived by the [p]roducts' allegedly misleading representations, let alone what kind of injunctive relief would prevent such a deception" (alterations and quotation marks omitted)).

Plaintiff's arguments in opposition do not change the Court's conclusion. Plaintiff appears to argue that *Berni* does not mandate dismissal of Plaintiff's claim for injunctive relief because Plaintiff "seeks monetary damages *in addition to* injunctive relief." (Pl.'s Mem. 24 (emphasis in original).) The Court is perplexed as to how Plaintiff's claim for monetary damages could have any effect on Plaintiff's claim for injunctive relief, as "a plaintiff must demonstrate standing for each claim and form of relief sought," *Cacchillo*, 638 F.3d at 404, and while "past injuries may provide a basis for standing to seek money damages, they do not confer standing to seek injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the future in a similar way," *Nicosia*, 834 F.3d at 239; *see also Rivera*, 2021 WL 4392300, at *9 (rejecting the plaintiffs' argument that "their claims for monetary relief salvage their claims for injunctive relief"). Neither is the Court convinced by Plaintiff's citations to

19

*Belfiore v. Procter & Gamble Co.*, 94 F. Supp. 3d 440 (E.D.N.Y. 2015), and *Goldemberg v.*

*Johnson & Johnson Consumer Cos.*, 317 F.R.D. 374 (S.D.N.Y. 2016), (Pl.'s Mem. 24), both of

which—as Defendant points out, (*see* Def.'s Reply 2)—were decided prior to *Berni*.  Defendant

also correctly points out that the court's reasoning in *Belfiore* was, in fact, expressly rejected by

the Second Circuit in *Berni*.  (*See* Def.'s Reply Mem. 2 n.2 (citing *Berni*, 964 F.3d at 148 &

n.32).)

Because Plaintiff lacks standing to pursue injunctive relief, either on her own behalf or on

behalf of the proposed class, *see Nicosia*, 834 F.3d at 239, the Court dismisses all claims for

injunctive relief.[2, 3]

## 2.  New York General Business Law §§ 349 and 350 Claims

"Section 349 [of the GBL] prohibits 'deceptive acts or practices in the conduct of any

business, trade[,] or commerce,' whereas § 350 prohibits 'false advertising in the conduct of any

business, trade[,] or commerce.'"  *Wynn v. Topco Assocs., LLC*, No. 19-CV-11104, 2021 WL

168541, at *2 (S.D.N.Y. Jan. 19, 2021) (alterations omitted) (quoting N.Y. G.B.L. §§ 349, 350).

"'The standard for recovery under . . . § 350, while specific to false advertising, is otherwise

identical to [§] 349,' and therefore the Court will merge its analysis of the two claims."

*Cosgrove v. Oregon Chai, Inc.*, 520 F. Supp. 3d 562, 575 (S.D.N.Y. 2021) (citation omitted)

---

[2] The Court notes that this holding is, in fact, supported by *Gavilanes v. Gerber Prods. Co.*, No. 20-CV-5558, 2021 WL 5052896 (S.D.N.Y. Nov. 1, 2021), the decision which Plaintiff provided to this Court as supplemental authority, (*see* Dkt. No. 22).  *See Gavilanes*, 2021 WL 5052896, at *4–5 (denying the plaintiff's request for injunctive relief for lack of standing).

[3] This is far from the first time that Plaintiff's counsel has unsuccessfully attempted to argue that his client was entitled to injunctive relief under analogous circumstances.  *See, e.g.*, *Brown*, 2021 WL 5446007, at *11; *Rivera*, 2021 WL 4392300, at *8–9.  It should now be abundantly clear to Plaintiff's counsel that the Second Circuit has squarely foreclosed the possibility of injunctive relief for past purchasers and thus, that a claim for injunctive relief on behalf of a past purchaser is plainly frivolous.  Plaintiff's counsel is now on notice that should he attempt to bring such a claim before this Court again, the Court will impose Rule 11 sanctions.

(quoting *Goshen v. Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190, 1195 n.1 (N.Y. 2002)); *see also Barreto v. Westbrae Nat., Inc.*, 518 F. Supp. 3d 795, 802 (S.D.N.Y. 2021) (same); *Duran v. Henkel of Am., Inc.*, 450 F. Supp. 3d 337, 346 (S.D.N.Y. 2020) (noting that "courts have found that the scope of § 350 is as broad as that of § 349 . . . and that its essential elements are the same" (alteration in original) (citation omitted)).  To state a claim under either section, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Wynn*, 2021 WL 168541, at *2 (quoting *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015)); *see also Cosgrove*, 520 F. Supp. 3d at 575 (same); *Twohig v. Shop-Rite Supermarkets, Inc.*, 519 F. Supp. 3d 154, 160 (S.D.N.Y. 2021) (same).

### a.  Consumer-Oriented Conduct

Defendant appears to concede—or at least, does not contest for purposes of its Motion—that its conduct was consumer-oriented.  (*See generally* Def.'s Mem.)  "A defendant engages in 'consumer-oriented' activity if [the company's] actions cause any 'consumer injury or harm to the public interest.'"  *New York v. Feldman*, 210 F. Supp. 2d 294, 301 (S.D.N.Y. 2002) (quoting *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 264 (2d Cir. 1995)).  This requirement is liberally construed, *id.*, and "may be satisfied by showing that the conduct at issue 'potentially affect[s] similarly situated consumers,'" *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010) (alteration in original) (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 647 N.E.2d 741, 745 (N.Y. 1995)).  Here, Plaintiff alleges that Defendant is responsible for "manufactur[ing], market[ing][,] and sell[ing]" the Product, which is sold under Defendant's store brand and presumably available at all of Defendant's "approximately 1,900 . . . stores in all fifty states"—or at least was certainly available to all consumers shopping at Defendant's store in Mount Vernon in May 2020, where Plaintiff purchased the Product.

21

(FAC ¶¶ 1, 75, 79.)  These allegations are sufficient to satisfy the first element of Plaintiff's GBL claim.  *See Karlin v. IVF Am., Inc.*, 712 N.E.2d 662, 665 (N.Y. 1999) (observing that GBL §§ 349 and 350 "apply to virtually all economic activity, and their application has been correspondingly broad" (footnote omitted) (collecting cases)); *Sheth v. N.Y. Life Ins. Co.*, 709 N.Y.S.2d 74, 75 (App. Div. 2000) (noting that "consumer-oriented" requirement may be satisfied "by a showing that the practice has a broader impact on the consumer at large").

### b.  Materially Misleading Conduct

Defendant instead focuses on the second element of Plaintiff's GBL claims, arguing that Plaintiff cannot state a cognizable claim for violations of GBL §§ 349 and 350 because Plaintiff has failed to identify an actionable misrepresentation on the Product label which would deceive a reasonable consumer.  (*See* Def.'s Mem. 10–18.)

To survive a motion to dismiss, Plaintiff "must do more than plausibly allege that a label might conceivably be misunderstood by some few consumers." *Twohig*, 519 F. Supp. at 161 (quoting *Sarr v. BEF Foods, Inc.*, No. 18-CV-6409, 2020 WL 729883, at *3 (E.D.N.Y. Feb. 13, 2020)).  "Instead, plaintiffs must 'plausibly allege that a significant portion of the general consuming public or of targeted customers, acting reasonably in the circumstances, could be misled.'"  *Id.* (quoting *Sarr*, 2020 WL 729883, at *3).  And, "[a]lthough the question of whether a business practice or advertisement is misleading to a reasonable consumer is generally a question of fact, it is 'well settled that a court may determine as a matter of law that an allegedly deceptive practice would not have misled a reasonable consumer.'"  *Id.* (alteration omitted) (quoting *Wynn*, 2021 WL 168541, at *2); *see also Brown*, 2021 WL 5446007, at *2 (same).  Here, Plaintiff has failed to plausibly allege that any portion of the Product's label is misleading.

<u>i.  Nutritional Information</u>

Plaintiff appears to allege that the Product's labeling is misleading with regard to its nutritional information in several ways, most of which stem from the Product's fundamental deception, which is that the Product is labeled and marketed in a similar manner to the Infant Formula to create the incorrect impression that the Product will provide to toddlers what the Infant Formula provides to infants: unique nutritional value, verified by its compliance with relevant FDA regulations.  (*See, e.g.*, FAC ¶¶ 10–21.)  To help achieve this deception, Plaintiff alleges that Defendant concealed such information such as the fact that the Product contains added sugar and is less nutritious (and more expensive) than whole cow's milk.  (*See, e.g.*, *id.* ¶¶ 23–31.)  However, in making these allegations, Plaintiff has failed to actually identify a material misstatement or omission on the Product's label that would deceive a reasonable consumer, which is fatal to her claim.  *See Dixon v. Ford Motor Co.*, No. 14-CV-6135, 2015 WL 6437612, at *8 (E.D.N.Y. Sept. 30, 2015) (dismissing GBL § 349 claim based on alleged misrepresentations where "the GBL § 349 allegations in the complaint generally refer to advertisements or statements that were false or misleading, [but] . . . never identifies the specific advertisements or statements at issue"); *Horowitz v. Stryker Corp.*, 613 F. Supp. 2d 271, 287 (E.D.N.Y. 2009) (dismissing GBL §§ 349 and 350 claims where "[the] plaintiff makes no reference to the specific 'acts, misrepresentations[,] and/or omissions' that she claims are deceptive nor does she allege why these acts were deceptive").  The Court examines each of Plaintiff's alleged misrepresentations, in turn.

First and foremost, Plaintiff alleges that Defendant's "marketing scheme" is deceptive because it creates the "false impression" that the Product will "give toddlers the nutrition that they wouldn't get from other sources" and is thus the necessary "next step" in toddler development.  (Pl.'s Mem. 5 (quotation marks omitted).)  However, Plaintiff fails to identify any

23

misstatements on the Product's label that deceive caregivers in this manner.  Nowhere on the label does Defendant claim that the Product gives toddlers nutrition that they would not get from other sources, that the Product is necessary for development, that the Product is recommended by pediatric health experts, or that the Product is to toddlers what the Infant Formula is to infants. (*See* FAC ¶ 10, RJN Ex. 1.)  *See Brady v. Basic Research, L.L.C.*, 101 F. Supp. 3d 217, 236–37 (E.D.N.Y. Mar. 31, 2015) (dismissing GBL § 349 claim where "the [product's] packaging in the [complaint] does not represent that the product is safe, and cannot, therefore, amount to a material misrepresentation as a matter of law").  Rather, Plaintiff seems to take issue with the Transition Formula industry as a whole—as evidenced by the academic articles to which Plaintiff cites, none of which is specific to Defendant or the Product, (*see* FAC ¶¶ 4 n.2, 5 n.3, 7 n.4; RJN Ex. 3)—but Plaintiff's allegations that the Transition Formula industry as a whole deceives consumers do not satisfy Plaintiff's burden to allege that a specific advertisement or statement by Defendant would mislead a reasonable consumer as to the Product.  Nor can Plaintiff succeed by alleging that Defendant improperly omitted this information from the Product's label, because a plaintiff can only state a claim for omission under the GBL "where the business alone possesses material information that is relevant to the consumer and fails to provide this information."  *Dixon*, 2015 WL 6437612, at *8 (collecting cases); *see also Yodice v. Touro Coll. & Univ. Sys.*, No. 21-CV-2026, 2021 WL 5140058, at *5 (S.D.N.Y. Nov. 4, 2021) ("Material omissions must be shown by demonstrating that 'the business alone possesses material information that is relevant to the consumer and fails to provide this information.'" (quoting *Oswego*, 647 N.E.2d at 745)).  Clearly, Defendant did not alone possess the information that Transitional Formulas like the Product do not give toddlers unique nutritional value, are not necessary for development, are not recommended by pediatric health experts, and are not to

toddlers what infant formulas are to infants, since, according to Plaintiff, pediatric health experts have been publishing this information since as early as the 1980s.  (*See* FAC ¶ 5 n.3.)

Plaintiff's urging that the Court consider the "surrounding context" is unhelpful.  (Pl.'s Mem. 5–6.)  Plaintiff is correct in principle that "'[c]ourts view each allegedly misleading statement in light of its context on the product label or advertisement as a whole,'" and that "'[t]he entire mosaic is viewed rather than each tile separately.'"  (*Id.* at 5 (quoting *Belfiore v. Proctor & Gamble Co.*, 311 F.R.D. 29, 53 (E.D.N.Y. 2015)).)  *See also Pichardo v. Only What You Need, Inc.*, No. 20-CV-493, 2020 WL 6323775, at *2 (S.D.N.Y. Oct. 27, 2020) ("When analyzing whether a label is deceptive, courts do not view the label in isolation.  Instead, courts view each allegedly misleading statement in light of its context on the product label or advertisement as a whole." (alteration and quotation marks omitted)).  But common sense dictates that a necessary prerequisite to viewing "each allegedly misleading statement in light of its context on the product label or advertisement as a whole," (Pl.'s Mem. 5 (quotation marks omitted)), is the existence of a misleading statement, which, again, Plaintiff has not identified.  Plaintiff cannot maintain a claim for violations of GBL §§ 349 or 350 based on misrepresentations with respect to the unique nutritional value—of lack thereof—of the Product.

Second, Plaintiff alleges that the Product's label is misleading because it conceals the fact that the Product contains two grams of added sugar per serving by only including this information in the fine-printed ingredients list, which includes "corn syrup solids."  (Pl.'s Mem. 6–9.)  First, the Court must note that the fact that the Product includes two grams of added sugar per serving is not indicated only by the inclusion of "corn syrup solids" in the fine-printed ingredient list, but also by the inclusion of "Incl. 2g Added Sugars" in considerably larger print in the Nutrition Facts panel.  (*See* Def.'s RJN Ex. 1.)  Moreover, there are no statements on the

Product's label which suggest that the Product does *not* contain added sugar.  (*See* FAC ¶ 10; RJN Ex. 1.)  As such, Plaintiff's allegation seems to rest on the inference that a reasonable consumer shopping for the Product would assume that the Product does not have any added sugars and would not read the Product's label to confirm this assumption.  But "[i]t is unreasonable—as Plaintiff attempts—to suggest that a consumer is not required to read a product's label to obtain information.  Reasonableness cannot be based solely on what the consumer might have known prior to picking up the Product[] and examining the label[]."  *Devane v. L'Oréal USA, Inc.*, No. 19-CV-4362, 2020 WL 5518484, at *5 n.3 (S.D.N.Y. Sept. 14, 2020).  Plaintiff's citations to cases such as *Mantikas v. Kellog Co.*, 910 F.3d 633 (2d Cir. 2018), are inapposite.  (*See* Pl.'s Mem. 7–8.)  In *Mantikas*, the Second Circuit held that "a reasonable consumer should not be expected to consult the Nutrition Facts panel on the side of the box to correct misleading information set forth in large bold type on the front of the box," 910 F.3d at 637, but Plaintiff here has not alleged that there is any "misleading information set forth in large bold type" on the Product that the information in the Nutrition Facts corrects, *see Sarr*, 2020 WL 729883, at *5 (holding *Mantikas* to be inapplicable where "the ingredient list . . . does not correct any misleading information").  As such, Plaintiff cannot maintain a claim for violations of GBL §§ 349 and 350 based on misrepresentations as to the Product's added sugar.

Third, Plaintiff alleges that the Product is misleading because it is less nutritious than whole cow's milk.  This claim fails for the same reason that Plaintiff's other claims fail: the Product's label makes no representation as to its nutritiousness as compared to whole cow's milk and it is clear that Defendant did not alone possess the information that the Product is less nutritious than whole cow's milk, based on Plaintiff's citation to publications containing this information.  (*See* FAC ¶¶ 10, 30 n.8; Def.'s RJN Ex. 1.)  *See Brady*, 101 F. Supp. 3d at 236–37

(dismissing GBL § 249 claim where "the [product's] packaging in the [complaint] does not represent that the product is safe, and cannot, therefore, amount to a material misrepresentation as a matter of law"); *Dixon*, 2015 WL 6437612, at *8 (explaining that a plaintiff can only maintain a GBL § 349 claim based on omission "where the business alone possesses material information that is relevant to the consumer and fails to provide this information" (collecting cases)). As such, Plaintiff cannot maintain a claim for violations of GBL §§ 349 and 350 based on misrepresentations regarding the Product's nutritional value as compared to whole cow's milk.

### ii.  Non-GMO

Plaintiff separately alleges that the Product's labeling is misleading with regard to its representation that the Product is "non-GMO." (*See* FAC ¶¶ 35–60.)  Specifically, Plaintiff alleges that Defendant's inclusion of a graphic reading "non-GMO" with a subheading reading "ingredients not genetically engineered" was deliberately designed to mimic the Non-GMO Project's Product Verification Program seal, and deceived consumers into believing that the Product was verified by the Non-GMO Project as containing neither any GMO crops nor any byproducts from animals fed GMO crops. (*See id.*)  Having been presented both with a close-up photo of the non-GMO graphic on the Product and the Non-GMO Project's Product Verification Program seal, the Court finds Plaintiff's allegation that a reasonable consumer could see the Product's non-GMO graphic and believe the Product to have been verified by the Non-GMO Project to be "patently implausible" or "unrealistic." *Eidelman v. Sun Prods. Corp.*, No. 16-CV-3914, 2017 WL 4277187, at *4 (S.D.N.Y. Sept. 25, 2017) (quotation marks omitted).  The Non-GMO Project's seal is highly distinctive, including the name of the organization, the word "VERIFIED," and the URL to the Non-GMO Project's website alongside a graphic of an orange butterfly on a blade of grass. (*See* Def.'s RJN Ex. 2.)  The only similarity between the Non-

27

GMO Project's seal and the Product's non-GMO graphic is the use of the term "non-GMO." (*Compare* FAC ¶ 45 *with* Def.'s RJN Ex. 2.)  Moreover, accepting Plaintiff's premise would prohibit a company from ever including the information that the ingredients in its products were non-GMO on labels unless the products were verified by the Non-GMO Project.

The only case that Plaintiff cites in her Opposition is *Koh v. S.C. Johnson & Son, Inc.*, No. 09-CV-927, 2010 WL 94265 (N.D. Cal. Jan. 6, 2010), (*see* Pl.'s Mem. 11), which is easily distinguishable.  In *Koh*, the defendant made use of a label on its packaging which read: "Greenlist™ Ingredients" with the subheading "Same Great Product!" and a logo of a leaf.  2010 WL 94265, at *1.  The plaintiff alleged that the use of this label was misleading, because it created the impression that the product was independently verified by a third-party organization called "Greenlist™," when in reality, "Greenlist™" was an organization created by the defendant.  *Id.*  The only indication on the label that "Greenlist™" may have been created by the defendant was in the fine print on the back side of the label, which read: "For additional information, visit www.scjohnson.com."  *Id.*  The court thus found that "[g]iven the context described in the complaint, it is plausible that a reasonable consumer would interpret the Greenlist label as being from a third party."  *Id.* at *2.  Unlike the "Greenlist™" label, the non-GMO graphic on Defendant's product does not include a unique name, a logo, or a trademark symbol; all it includes is the term "non-GMO," which is simply descriptive.  No reasonable consumer could view the "non-GMO" graphic and interpret it as referencing a third party.  As such, Plaintiff cannot maintain a claim for violations of GBL §§ 349 and 350 based on a misrepresentation as to the Product's verification (or non-verification) by the Non-GMO Project.

The FAC is quite specific in alleging that the non-GMO graphic on the Product is misleading because it mimics the Non-GMO Project's Product Verification Program seal, and

thus, allegedly deceives consumers into believing that the Product has been verified by the Non-GMO Project.  (*See* FAC ¶¶ 35–60.)  To the extent Plaintiff alleges that the non-GMO graphic is misleading because the Product "contains dairy ingredients including milk and lactose, that come from cows fed GMO grains," (*id.* ¶ 55)—and not based on any affiliation or lack thereof with the Non-GMO Project—this claim is dismissed for failure to allege that Plaintiff relied on this alleged misrepresentation, *see infra*.

### c. Injury

Defendant also argues that Plaintiff has failed to adequately allege injury under GBL §§ 349 or 350, because she does not allege that she "ever saw either the Product label or the Infant Formula label," that "she relied on any of [the Product label's] representations in purchasing the Product," or any details concerning the alleged "price premium" she paid for the Product.  (Def.'s Mem. 19–20.)  The Court, again, agrees.

"An actual injury claim under [§§] 349 and 350 typically requires a plaintiff to allege that, on account of a materially misleading practice, she purchased a product and did not receive the full value of her purchase." *Duran*, 450 F. Supp. 3d at 350 (alteration omitted) (quoting *Daniel v. Mondelez Int'l, Inc.*, 287 F. Supp. 3d 177, 195 (E.D.N.Y. 2018)).  "A plaintiff can show this injury by alleging 'an overpayment, or a price premium, whereby a plaintiff pays more than she would have but for the deceptive practice.'" *Id.* (quoting *Izquierdo v. Mondelez Int'l Inc.*, No. 16-CV-4697, 2016 WL 6459832, at *7 (S.D.N.Y. Oct. 26, 2016)).  However, "[t]o allege injury under a price premium theory, a plaintiff must allege not only that [the] defendants charged a price premium, but also that there is a connection between the misrepresentation and any harm from, or failure of, the product."  *Id.* (quotation marks omitted); *see also Sabatano v. Iovate Health Scis. U.S.A. Inc.*, No. 19-CV-8924, 2020 WL 3415252, at *3 (S.D.N.Y. June 22, 2020) ("A plaintiff must also demonstrate reliance, which typically means he must point to a

specific advertisement or public pronouncement upon which the consumer relied." (citation omitted)); *Horowitz*, 613 F. Supp. 2d at 288 ("In order to make a claim under [GBL § 350], a plaintiff must plead reliance on a false advertisement at the time the product was purchased." (citing *Andrew Strishak & Assocs., P.C. v. Hewlett Packard Co.*, 752 N.Y.S.2d 400, 403 (App. Div. 2002))).

Plaintiff has failed to allege injury here because she has failed to allege that she relied on any representations made on the Product's label in purchasing the Product. While Plaintiff claims that "[h]ad Plaintiff and proposed class members known the truth, they would not have bought the Product or paid less for it," that "Plaintiff paid more for the Product based on the representations than she would have otherwise paid," that "Plaintiff bought the Product because she expected it would be nutritionally adequate for children over one year old for whom she is or was a caregiver," and vaguely that "Plaintiff relied on the representations," (FAC ¶¶ 64, 65, 80, 81, 82, 97, 98), Plaintiff fails to identify a single "specific advertisement or public pronouncement" on which she relied in purchasing the Product, *Sabatano*, 2020 WL 3415252, at *3. This is fatal to her claims. *See Horowitz*, 613 F. Supp. 2d at 288 (dismissing GBL §§ 349 and 350 claims because the plaintiff "never specifies what false representations [the] defendants made nor does she allege that she ever relied on any representations made by [the] defendants").

Accordingly, Plaintiff's claims based on alleged violations of GBL §§ 349 and 350 are dismissed.[4, 5]

---

[4] Because the Court has found Plaintiff has failed to state a cognizable claim for violations of GBL §§ 349 and 350 based on the Product's non-GMO graphic, the Court need not determine whether Plaintiff's claims relating to the non-GMO graphic are preempted. (*See* Def.'s Mem. 18–19.)

[5] While the Court recognizes that the *Gavilanes* court came to the opposite conclusion under similar circumstances, *see Gavilanes*, 2021 WL 5052896, at *5–6, and the Court does not agree with the *Gavilanes* court's conclusion.

### 3.  Breach of Warranty Claims

#### a.  Breach of Express Warranty

"An express warranty is an affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain." *Barreto*, 518 F. Supp. 3d at 806 (quotation marks omitted).  To adequately state a claim for breach of an express warranty under New York law, Plaintiff must plead "(1) the existence of a material statement amounting to a warranty, (2) the buyer's reliance on this warranty as a basis for the contract with the immediate seller, (3) breach of the warranty, and (4) injury to the buyer caused by this breach." *Wynn*, 2021 WL 168541, at *7 (quoting *Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467, 482 (S.D.N.Y. 2014)).  Under the New York Uniform Commercial Code, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall confirm to the affirmation or promise," and "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." *Singleton v. Fifth Generation*, No. 15-CV-474, 2016 WL 406295, at *10 (N.D.N.Y. Jan. 12, 2016) (alterations in original) (quoting N.Y. U.C.C. § 2-313(1)(a), (b)).  Moreover, "[a] buyer may bring a claim against a manufacturer from whom he did not purchase a product directly, since an express warranty 'may include specific representations made by a manufacturer in its sales brochures or advertising regarding a product upon which a purchaser relies.'" *Goldemberg*, 8 F. Supp. 3d at 482 (quoting *Arthur Glick Leasing, Inc. v. William J. Petzold, Inc.*, 858 N.Y.S.2d 405, 407 (App. Div. 2008)); *see also Randy Knitwear, Inc. v. Am. Cyanamid Co.*, 181 N.E.2d 399, 401, 404 (N.Y. 1962) ("dispens[ing] with the requirement of privity" for claims of "breach of express warranty by a remote purchaser against a manufacturer

31

who induced the purchase by representing the quality of the goods in public advertising and on labels which accompanied the goods").

Defendant argues that Plaintiff has failed to state a cognizable claim for beach of express warranty because Plaintiff has failed to plead "'a specific affirmation of fact or promise that is false or misleading' as required to establish an express warranty." (Def.'s Mem. 22 (quoting *DiBartolo v. Abbott Labs.*, 914 F. Supp. 2d 601, 627 (S.D.N.Y. 2012)).)  "While no formal wording is necessary to create an express warranty, there must be a representation of fact or specific promise about the product."  *Haft v. Haier U.S. Appliance Sols., Inc.*, No. 21-CV-506, 2022 WL 62181, at *6 (S.D.N.Y. Jan. 5, 2022) (quoting *Brodie v. Green Spot Foods, LLC*, 503 F. Supp. 3d 1, 9 (S.D.N.Y. 2020)).  For the reasons described above, the Court finds that the Plaintiff has failed to identify any "specific affirmation of fact or promise," (Def.'s Mem. 22 (quotation marks omitted)), regarding the Product's nutritional information, and thus, cannot state a claim for breach of express warranty on this basis.  *See supra* II.B.2.b.i.  And while Defendant's representation that the Product is "non-GMO," (FAC ¶ 45), could be specific enough to create an express warranty and Plaintiff's allegation that "the Product contains dairy ingredients . . . that come from cows fed GMO grains," (*id.* ¶ 55), could be enough to allege that this express warranty was breached, Plaintiff has failed to allege either reliance or injury for the reasons described above.  *See supra* II.B.2.c.  As such, Plaintiff cannot state a cognizable claim for breach of express warranty based on the non-GMO graphic, either.

Moreover, Plaintiff's breach of express warranty claim is subject to dismissal for the separate and independent reason that Plaintiff has failed to allege that she provided Defendant with pre-suit notice.  "To assert a breach of warranty claim under New York Law, 'the buyer must within a reasonable amount of time after he discovers or should have discovered any breach

notify the seller of breach or be barred from any remedy.'" *Tomasino v. Estee Lauder Cos.*, 44 F. Supp. 3d 251, 260 (E.D.N.Y. 2014) (alterations omitted) (quoting N.Y. U.C.C. § 2-607(3)(a)). To satisfy this notice, a plaintiff must "alert [the] defendant that the transition was troublesome," but need not "include a claim for damages or threat of future litigation." *Grossman v. Simply Nourish Pet Food Co.*, 516 F. Supp. 3d 261, 282 (E.D.N.Y. Jan. 27, 2021) (alterations and quotation marks omitted). Although "[t]he sufficiency and timeliness of the notice is generally a question for the jury," *Tomasino*, 44 F. Supp. 3d at 260 (citation omitted), to adequately plead the pre-suit notice requirement, "plaintiff[s] must provide factual allegations—such as the date and method plaintiff[s] sent a pre-suit notice—supporting the contention that [they] notified [the] defendant of the alleged breach within a reasonable time," *Grossman*, 516 F. Supp. 3d at 283.

Here, the FAC is devoid of any allegation that Plaintiff provided Defendant with any manner of pre-suit notice; instead, Plaintiff vaguely alleges that "Plaintiff provided or will provide notice to [D]efendant, its agents, representatives, retailers and their employees" and "Defendant received notice and should have been aware of these issues due to complaints by regulators, competitors, and consumers, to its main offices since the Product has been sold." (FAC ¶¶ 102, 103.) This is insufficient to avoid dismissal. *See Colpitts v. Blue Diamond Growers*, 527 F. Supp. 3d 562, 590 (S.D.N.Y. 2021) (finding allegation that "[the] [d]efendant received notice and should have been aware of these misrepresentations due to numerous complaints by consumers to its main office over the past several years" to be "too conclusory and . . . unsupported by any specific factual allegations" to satisfy the notice requirement for suit (quotation marks omitted)); *Grossman*, 516 F. Supp. 3d at 283 (finding that the plaintiff's allegation that "within a reasonable time after they knew or should have known of [the] [d]efendants' breach, [the] [p]laintiff, on behalf of herself and [c]lass [m]embers, placed [the]

[d]efendants on notice of their breach, giving [the] [d]efendants an opportunity to cure their breach, which they refused to do" was "insufficient to plead pre-suit notice" (quotation marks omitted)); *Petrosino v. Stearn's Prods., Inc.*, No. 16-CV-7735, 2018 WL 1614349, at *2 (S.D.N.Y. Mar. 30, 2018) (explaining that "[p]roper factual allegations should, at least, include the date and method by which [the] [p]laintiff afforded [pre-suit] notice to [the] [d]efendant," and dismissing claim for breach of express warranty where "[the] [p]laintiffs failed to allege any facts supporting the allegation that she notified [the] [d]efendant of the alleged breach within a reasonable time after its discovery").

Plaintiff's arguments that pre-suit notice is not required or, in the alternative, that Plaintiff's pleadings constitute notice, are unavailing. (*See* Pl.'s Mem. 21–22.) While Plaintiff is correct that there is a "line of New York cases suggesting that the notice requirement does not apply to retail sales," *Neri v. R.J. Reynolds Tobacco Co.*, No. 98-CV-371, 2000 WL 33911224, at *19 (N.D.N.Y. Sept. 28, 2000) (citing *Fischer v. Mead Johnson Labs.*, 341 N.Y.S.3d 257, 259 (App Div. 1973)), Defendant correctly points out "the exception to the notice requirement for retail consumers does not apply where, as here, a plaintiff alleges only economic injury," (*see* Def.'s Reply Mem. 9 (collecting cases)). *See also Colpitts*, 527 F. Supp. 3d at 589 (explaining that "[b]ecause [the] [p]laintiff only alleges economic injury in the form of a price premium paid for the [p]roduct, this exception—to the extent it exist at all—is inapplicable," and dismissing breach of express warranty claim for failure to allege pre-suit notice). And, while Plaintiff is correct that there is limited authority for the proposition that a plaintiff's pleadings could constitute pre-suit notice under certain circumstances, (*see* Pl.'s Mem. 21), the Court is persuaded by Judge Failla's reasoning in *Lugones v. Pete & Gerry's Organic, LLC*, 440 F. Supp. 3d 226 (S.D.N.Y. 2020), in which she explained that the case from which this limited

authority stems—*Panda Capital Corp. v. Kopo Int'l, Inc.*, 662 N.Y.S.2d 584 (App. Div. 1997)— does not stand "for a broad rule that a filed complaint qualifies as sufficient and timely notice." 440 F. Supp. 3d at 244–45.[6]

Accordingly, Plaintiff's claim for breach of express warranty is dismissed.[7]

### b.  Breach of the Implied Warranty of Merchantability

"Under the New York Uniform Commercial Code . . . , 'a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.'" *Brodie*, 503 F. Supp. 3d at 8 (quoting N.Y. U.C.C. § 2-314(1)).  "To be merchantable, goods 'must be fit for the ordinary purposes for which such goods are used; and conform to the promises or affirmations of fact made on the label or container if any.'" *Id.* at 9 (alterations omitted) (quoting N.Y. U.C.C. § 2-314(2)).  "A seller of food products, including a retailer, is bound by the implied warranty that goods are fit for human consumption and therefore merchantable." *Id.* (citing *Mongiello's Italian Cheese Specialties, Inc. v. Euro Foods Inc.*, No. 14-CV-2902, 2018 WL 4278284, at *37 (S.D.N.Y. Mar. 30, 2018)); *see also Silva v. Smucker Nat. Foods, Inc.*, No. 14-CV-6154, 2015 WL 5360022, at *11 (S.D.N.Y. Sept. 14, 2015) ("[T]he warranty does not mean that the product will fulfill a buyer's every expectation but simply provides for a minimum level of quality." (quotation marks omitted)).

---

[6] Plaintiff also argues that privity is not required to state a breach of express warranty. (*See* Pl.'s Mem. 22.)  While the Court agrees for the reasons described above, the Court notes that Defendant did not argue that Plaintiff failed to state a cognizable claim for breach of express warranty due to lack of privity. (*See generally* Def.'s Mem.)  Rather, Defendant made this argument in the context of Plaintiff's claim for negligent misrepresentation. (*See id.* at 22.)

[7] While the Court recognizes that, again, the *Gavilanes* court came to the opposite conclusion under similar circumstances, the *Gavilanes* court engaged in even less analysis on this issue, and relied on a misapplication of New York law as to pre-suit notice. *See Gavilanes*, 2021 WL 5052896, at *7.  As such, the Court will not adopt its conclusion.

Plaintiff concedes that she "did not allege that the Product was unfit for human consumption," (Pl.'s Mem. 23 (quotation marks omitted)), and thus, Plaintiff concedes she has failed to allege a cognizable claim for breach of the implied warranty of merchantability.  While Plaintiff argues that she did allege that the Product was "not capable of passing without objection in the trade," (*id.* (quotation marks omitted)), since pediatric health experts advise against Transitional Formulas like the Product, Plaintiff has provided no authority for the notion that a food product must be recommended by relevant experts to be merchantable.  Indeed, the only case that Plaintiff cites in support of this argument, *Jackson v. Eddy's LI RV Ctr., Inc.*, 845 F. Supp. 2d 523 (E.D.N.Y. 2012), concerned claims arising from the plaintiff's ownership of a motor home, *id.* at 527; *see also Silva*, 2015 WL 5360022, at *11 (recognizing that merchantability is "a guarantee by the seller that its goods . . . will pass in the trade without objection," but noting that "[w]here the sale of food or beverage is concerned, courts have ruled that the product need only be fit for human consumption to be of merchantable quality" (quotation marks omitted) (collecting cases)).

Accordingly, Plaintiff's claim for breach of the implied warranty of merchantability is dismissed.

### c.  MMWA

"To state a claim under the MMWA, plaintiffs must adequately plead a cause of action for breach of written or implied warranty under state law," *Garcia v. Chrysler Grp. LLC*, 127 F. Supp. 3d 212, 232 (S.D.N.Y. 2015), because "the federal statute incorporates state law claims of breach of express and implied warranties," *Chiarelli v. Nissan N. Am., Inc.*, No. 14-CV-4327, 2015 WL 5686507, at *9 (E.D.N.Y. Sept. 25, 2015).  Because the Court has already found Plaintiff's claims for breach of express and implied warranty to be subject to dismissal, Plaintiff's claim under the MMWA is similarly dismissed.  *See Chiarelli*, 2015 WL 5686507, at

*9 (dismissing claims under the MMWA where the plaintiffs had failed to state claims for breach of express or implied warranty); *Garcia*, 127 F. Supp. 3d at 232 (dismissing certain claims under the MMWA where the plaintiffs had failed to state claims for breach of express or implied warranty).[8]

### 4.  Negligent Misrepresentation Claim

"To state a claim for negligent misrepresentation under New York law, a plaintiff must allege that: '(1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment.'"  *Brown*, 2021 WL 5446007, at *7 (quoting *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 114 (2d Cir. 2012)); *see also Sarr*, 2020 WL 729883, at *6 ("Under New York law, 'a claim for negligent misrepresentation requires the plaintiff to demonstrate (1) the existence of a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff; (2) that the information was incorrect; and (3) reasonable reliance on the information.'" (alterations omitted) (quoting *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1009 (N.Y. 2011))). "Under the 'duty' element, New York strictly limits negligent misrepresentation claims to situations involving 'actual privity of contract between the parties or a relationship so close to approach

---

[8] The Court rejects Plaintiff's extraneous argument that Defendant's MMWA argument should not be credited because Defendant only included it in a footnote in its opening brief. (*See* Pl.'s Mem. 19.)  Because MMWA claims are derivative of state law claims, it was appropriate for Defendant to relegate its argument specifically as to the MMWA in a footnote—particularly because Defendant was contending with the challenge of addressing all nine of Plaintiff's causes of action, all based on several different alleged misrepresentations, within the Court's strict page limit.

that of privity.'" *Brown*, 2021 WL 5446007, at *7 (quoting *Anschultz*, 690 F.3d at 114).  "In the commercial context, a closer degree of trust between the parties than that of the ordinary buyer and seller is required to establish the existence of a special relationship capable of giving rise to an exceptional duty regarding commercial speech and justifiable reliance on such speech." *Id.* (alterations omitted) (quoting *Izquierdo*, 2016 WL 6459832, at *7); *Stoltz v. Fage Dairy Processing Indus., S.A.*, No. 14-CV-3826, 2015 WL 5579872, at *25 (E.D.N.Y. Sept. 22, 2015) (explaining that "courts have consistently held that advertisements alone are not sufficient" to allege the existence of a special relationship (collecting cases)).  The New York Court of Appeals in *Kimmell v. Schaefer*, 675 N.E.2d 450 (N.Y. 1996), set forth a number of factors to determine whether a special relationship exists:  (1) "whether the person making the representation held or appeared to hold unique or special expertise," (2) "whether a special relationship of trust of confidence existed between the parties," and (3) "whether the speaker was aware of the use to which the information would be and supplied it for that purpose," *id.* at 454; *see also Brown*, 2021 WL 5446007, at *7 (same).

The Parties here appear to agree on the standard for stating a cognizable claim for negligent misrepresentation, (*see* Def.'s Mem. 22; Pl.'s Mem. 16–19), but disagree as to whether Plaintiff has adequately plead the existence of a "special relationship" between Plaintiff and Defendant.  Plaintiff argues that the *Kimmell* factors counsel in favor of finding the existence of a special relationship between Plaintiff and Defendant, given that Defendant's store brand is known for its high quality and Defendant "was in a unique position to know the Product was nutritionally inappropriate for children in the targeted age range."  (Pl.'s Mem. 17.)  Defendant argues that these allegations are insufficient to create a special duty owed to Plaintiff, (*see* Def.'s Mem. 22; Def.'s Reply Mem. 7–8), and the Court agrees with Defendant.

Courts have resoundingly held that "[t]he requisite special relationship may not . . . be based solely on [a] [d]efendant['s] status as the manufacturer of the [product] because, if this alone were sufficient, a special relationship would necessarily always exist for purposes of misbranded food claims, which is not the case." *Stoltz*, 2015 WL 5579872, at *25; *see also Sarr*, 2021 WL 729883, at *6 (explaining that the defendant's "status as a trusted brand . . . does not give rise to a duty to impart correct information, as the plaintiffs comprise 'a faceless or unresolved class' of consumers" (alterations omitted) (quoting *Aetna Cas. & Sur. Co. v. Aniero Concrete Co.*, 404 F.3d 566, 584 (2d Cir. 2005) (per curiam))); *Wynn*, 2021 WL 168541, at *6 (dismissing negligent misrepresentation claim brought against almond milk manufacturer where the plaintiffs did not "plausibly allege[] the existence of a special or a privity-like relationship").

The Court also agrees with Defendant that the one case on which Plaintiff relies for the notion that Defendant and Plaintiff had a special relationship, *Greene v. Gerber Prods. Co.*, 262 F. Supp. 3d 38 (E.D.N.Y. 2017), (*see* Pl.'s Mem. 18), presented unique circumstances not present here, (*see* Def.'s Reply Mem. 7). Namely, in *Greene*, the plaintiffs alleged that the defendant "was aware of at least one major study that conclusively refuted [the] [d]efendant's health claim, and that [the] [d]efendant in fact sponsored that study and provided it with staff and funding." 262 F. Supp. 3d at 76 (quotation marks omitted). Critically, it was only based on this allegation of "unique expertise regarding the lack of scientific support for [the] [defendant's] representations about infant allergies and atopic dermatitis" that the court found that the plaintiffs had adequately pled the existence of a special duty of care owed by the defendant to the plaintiffs despite the court's finding that "[the] [p]laintiffs have not alleged a special relationship between themselves and [the] [d]efendant" because "they are a faceless or unresolved class of persons." *Id.* at 76–77. Here, Plaintiff has not alleged that Defendant had any such unique

expertise or scientific knowledge apart from her vague and conclusory allegation that Defendant must have had such expertise or knowledge "based on Defendant's outsized role in the market for this type of [p]roduct." (FAC ¶ 101; *see also* Pl.'s Mem. 18 ("As Defendant is one of the largest sellers of these types of products, it surely was in possession—or should have been—of the findings of independent public health groups[.]").) This is clearly insufficient. *See also Sarr*, 2020 WL 729883, at *6 (finding no special relationship in spite of allegations that the defendant "held itself out as having special knowledge," because "the bases of the plaintiffs' claims . . . were public information" and distinguishing *Greene* (quotation marks omitted)).

Accordingly, Plaintiff's claim for negligent misrepresentation is dismissed.[9]

### 5. Fraud Claim

"Under New York law, stating a claim for fraud requires alleging (1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." *Wynn*, 2021 WL 168541, at *7 (citing *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997)). And, as explained above, to adequately plead fraud, plaintiffs must also meet the particularity requirement in Federal Rule of Civil Procedure 9(b), which "requires that the plaintiff (1) detail the statements (or omissions) that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements (or omissions) were made, and (4) explain why the statements (or omissions) are fraudulent." *Fin. Guar. Ins. Co. v. Putnam Advisory Co.*, 783 F.3d 395, 403 (2d Cir. 2015). *See also supra* II.A.2.

---

[9] While the Court recognizes that, again, the *Gavilanes* court came to the opposite conclusion under similar circumstances, this Court does not agree with the *Gavilanes* court's analysis, which inappropriately credited the plaintiff's conclusory allegations. *See Gavilanes*, 2021 WL 5052896, at *8–9. As such, the Court will not adopt its conclusion.

Defendant argues that Plaintiff's fraud claim fails because Plaintiff has failed to allege scienter. (*See* Def.'s Mem. 21–22.) While Plaintiff argues in her Opposition that "the FAC exceeds particularity requirements for fraud [sic]," (Pl.'s Mem. 16 (capitalization adjusted)), Plaintiff does not respond to Defendant's argument that Plaintiff has failed to allege scienter, (*see id.*). "In the Second Circuit, a plaintiff's failure to respond to contentions raised in a motion to dismiss constitute[s] an abandonment of those claims." *Laface v. E. Suffolk BOCES*, No. 18-CV-1314, 2019 WL 1959489, at *8 (E.D.N.Y. May 2, 2019) (alteration and quotation marks omitted) (collecting cases). As such, the Court finds that Plaintiff has abandoned her scienter argument, and her fraud claim is subject to dismissal on this basis.

But even if the Court did consider Plaintiff's fraud claim on the merits, it would still be subject to dismissal based on Plaintiff's failure to adequately plead scienter. Briefly, Plaintiff's theory of scienter appears to be that Defendant made certain statements or omitted certain information on the Product's label in an effort to boost sales in light of declining demand for infant formula. (*See* FAC ¶¶ 6–10.) However, Defendant correctly points out that pointing to a company's general profit motive is insufficient to plead scienter. (*See* Def.'s Mem. 21 (citing *Sarr*, 2020 WL 729883, at *9).) *See also Duran*, 450 F. Supp. 3d at 354 ("[S]imply alleging a defendant's self-interested desire to increase sales does not give rise to an inference of fraudulent intent."). Plaintiff also vaguely alleges that "Defendant's fraudulent intent is evinced by its knowledge of the relevant regulations, as its misleading representations are careful to avoid glaringly prohibited statements but are still misleading." (FAC ¶ 112.) But this non-specific and conclusory allegation cannot satisfy Plaintiff's burden to state her fraud claim with particularity. *See Colpitts*, 527 F. Supp. 3d at 585 (finding allegation that "[t]he defendant's fraudulent intent is evinced by its failure to accurately identify the [p]roduct on the front label, when it knew its

statements were not true or accurate" to be "conclusory" and "fall short of the Rule 9(b) standard" (quotation marks omitted) (collecting cases)).

Accordingly, Plaintiff's fraud claim is dismissed.

### 6. Unjust Enrichment Claim

"The basic elements of an unjust enrichment claim in New York require proof that (1) [the] defendant was enriched, (2) at [the] plaintiff's expense, and (3) equity and good conscience militate against permitting [the] defendant to retain what [the] plaintiff is seeking to recover." *Briarpatch Ltd. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004). Unjust enrichment "lies as a quasi-contract claim" that "contemplates an obligation imposed by equity to prevent injustice, in the absence of an actual agreement between the parties." *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 745 (N.Y. 2012) (quotation marks omitted). New York's highest court has made clear, however, that "unjust enrichment is not a catchall cause of action to be used when others fail." *Corsello v. Verizon N.Y., Inc.*, 967 N.E.1177, 1185 (N.Y. 2012). Rather, the claim "is available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Id.* In other words, "[a]n unjust enrichment claim is not available where it simply duplicates, or replaces, a conventional contract or tort claim." *Id.*

The Second Circuit has stated that "[t]wo claims are duplicative of one another if they 'arise from the same facts and do not allege distinct damages.'" *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008) (alteration omitted) (quoting *Sitar v. Sitar*, 50 854 N.Y.S.2d 536, 538 (App. Div. 2008)). Here, the unjust enrichment claim is premised on the same factual allegations as those supporting Plaintiff's other claims, and Plaintiff has not alleged distinct damages with respect to this claim. (*See generally* FAC.) Accordingly, the Court must

dismiss Plaintiff's unjust enrichment claim as duplicative. *See, e.g.*, *Grossman*, 516 F. Supp. 3d at 284–85 (dismissing unjust enrichment claim that "duplicate[d] the plaintiff's other claims, which ar[o]se outside [of] identical facts," namely "the defendant's alleged misrepresentation on the product packaging"); *Wedra v. Cree, Inc.*, No. 19-CV-3162, 2020 WL 1322887, at *11 (S.D.N.Y. Mar. 20, 2020) (dismissing unjust enrichment claim that was "duplicative of [the] plaintiff's other claims for material misrepresentations rooted in statutory, contract, and tort law"); *Buonasera v. Honest Co.*, 208 F. Supp. 3d 555, 567–68 (S.D.N.Y. 2016) (dismissing unjust enrichment claim that "rel[ied] on the same set of facts" underlying the plaintiff's claims for deceptive labeling and breach of express warranty); *Mahoney v. Endo Health Sols., Inc.*, No. 15-CV-9841, 2016 WL 3951185, at *11 (S.D.N.Y. July 20, 2016) (dismissing unjust enrichment claim that "overlap[ped] with [the plaintiff's] fraud, fraudulent concealment, express warranty, and [GBL] § 349 claims").

While Plaintiff's observation that "under Rule 8(e)(2) of the Federal Rules of Civil Procedure, a plaintiff may plead two or more statements of a claim, even within the same count, regardless of consistency" is correct, (Pl.'s Mem. 23 (alteration omitted) (quoting *Henry v. Daytop Vill., Inc.*, 42 F.3d 89, 95 (2d Cir. 1994)), it does nothing to change the Court's conclusion, particularly because the case on which Plaintiff relies, *Henry*, concerned claims of race and gender discrimination, not products liability or unjust enrichment.

Accordingly, Plaintiff's claim for unjust enrichment is dismissed.[10]

---

[10] While the Court once again recognizes that the *Gavilanes* court came to the opposite conclusion under similar circumstances, the *Gavilanes* court engaged no analysis on this issue and relied on a misapplication of law as to pleading in the alternative. *See Gavilanes*, 2021 WL 5052896, at *9.

### III.  Conclusion

For the reasons stated above, Defendant's Motion is granted.  The Clerk of Court is respectfully directed to terminate the pending motion.  (*See* Dkt. No. 17.)

Because this is the first adjudication of Plaintiff's claims on the merits, dismissal of Plaintiff's claims is without prejudice.  The one exception is Plaintiff's claim for injunctive relief, which is dismissed with prejudice.  To the extent Plaintiff has a good faith basis for filing a second amended complaint, she must do so within 30 days of the date of this Opinion & Order.[11]  Failure to properly and timely amend will result in dismissal of these claims with prejudice.

SO ORDERED.

Dated:    March 18, 2022
          White Plains, New York

_____
KENNETH M. KARAS
United States District Judge

---

[11] The Court takes a moment to caution Plaintiff's counsel once again that Plaintiff may only file a second amended complaint where she has a *good faith basis* to do so.  As must be clear to Plaintiff's counsel based on the Court's citations in this Opinion & Order, the Court is well aware that Plaintiff's counsel routinely files cases such as these, which bring identical claims, and that they are just as routinely dismissed for failure to state a claim.  *See, e.g.*, *Brown*, 2021 WL 5446007; *Rivera*, 2021 WL 4392300; *Twohig*, 519 F. Supp. 3d 154; *Wynn*, 2021 WL 168541; *Barreto*, 518 F. Supp. 3d 795; *Cosgrove*, 2020 WL 7211218; *Pichardo*, 2020 WL 6323775.  This Court will not hesitate to follow the example of a growing number of its sister courts and dismiss Plaintiff's claims with prejudice should Plaintiff present this Court with the same allegations in a second amended complaint.